FILED
2014 Mar-26  PM 12:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **WILLIAM LLOYD WHITE,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **5:12-CV-03944-KOB** |
| **CAROLYN W. COLVIN,** | ) | |
| **Commissioner of the Social** | ) | |
| **Security Administration** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION</u>**

**I. INTRODUCTION**

On February 19, 2010, the claimant, William Lloyd White, applied for a period of

disability and for disability insurance benefits under Title II of the Social Security Act and for

supplemental security income under Title XVI of the Social Security Act. (R. 8). The claimant

alleges disability commencing on April 1, 2009 because of heart problems and back problems.

(R. 8, 131). The Commissioner denied the claim both initially and on reconsideration. (R. 8). The

claimant filed a timely request for a hearing before an Administrative Law Judge, and the ALJ

held a hearing on May 24, 2011. (R. 8). In a decision dated July 7, 2011, the ALJ found that the

claimant was not disabled as defined by the Social Security Act and thus was ineligible for a

period of disability, disability insurance benefits, or supplemental security income. (R. 17). On

September 24, 2012, the Appeals Council denied the claimant's request for review; consequently,

the ALJ's decision became the final decision of the Commissioner of the Social Security

Administration. (R. 1). The claimant has exhausted his administrative remedies, and this court

has jurisdiction pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons stated below, this court affirms the decision of the Commissioner.

## II. ISSUES PRESENTED

The claimant presents the following issues for review:

1. Whether the ALJ properly evaluated the opinion of Dr. Anastas, one of claimant's treating physicians;

2. Whether the ALJ properly considered claimant's heart condition in light of Listing 4.02;

3. Whether the ALJ erred in finding the claimant to have a residual functional capacity to perform at a light level of physical exertion; and

3. Whether the ALJ properly considered claimant's  in light of Medical-Vocational Guideline 201.10.

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm the Commissioner's decision if the Commissioner applied the correct legal standards and if the factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions, including determination of the proper standards to be applied in evaluating claims." *Walker*, 826 F.2d at 999. This court does not review the Commissioner's factual determinations *de novo*. The court will affirm those factual determinations that are supported by substantial evidence. "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a

2

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARDS

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step, sequential evaluation process:

(1) Is the person presently employed?
(2) Is the person's impairment severe?
(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. pt. 404, supbt. P, app. I?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

Throughout the process, the ALJ commits reversible error if he goes beyond his

3

discretion to make a determination of disability and disregards medical evidence in favor of his own impressions. "An ALJ...abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians." *Marbury v. Sullivan*, 957 F.2d 837, 840 (11th Cir. 1991) (Johnson concurring).

At step three, the claimant has the burden of proving that an impairment or impairments meet or equal a listed impairment. *Barron v. Sullivan*, 924 F.2d 227, 229 (11th Cir. 1991).

Listing 4.02 states as follows:

> 4.02 Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of severity for this impairment is met when the requirements in both A and B are satisfied.
>
> A. Medically documented presence of one of the following:
>
> 1. Systolic failure (see 4.00D1a(I)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
>
> 2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);
>
> AND
>
> B. Resulting in one of the following:
>
> 1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or
>
> 2. Three or more separate episodes of acute congestive heart failure within a consecutive 12–month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

4

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

At step five, the ALJ must determine whether the claimant has the ability to adjust to other work in the national economy by applying the Medical-Vocational Guidelines or by use of a vocational expert. *Phillips v. Barnhart*, 357 F.3d 1232, 1239 (11th Cir. 2004). The ALJ reviews medical and other evidence to determine the claimant's RFC to do work despite his impairment. 20 C.F.R. §§ 404.1520(e) and 416.920(e); *see also Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

An RFC assessment involves determining the claimant's ability to do work in spite of his impairments and in consideration of all relevant evidence. *Lewis*, 125 F.3d at 1440; *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ makes this determination by considering the claimant's ability to lift weight, sit, stand, push, pull, etc. 20 C.F.R. §§ 404.1545(b), 416.945(b).

The C.F.R. classifies jobs in the national economy as belonging to one of four levels of exertion: sedentary, light, medium, or heavy. 20 C.F.R. §§ 404.1567, 416.967. The C.F.R. defines sedentary work as requiring extended periods of sitting; "lifting no more than 10 pounds;" occasional "lifting or carrying articles like docket files, ledgers, and small tools;" and

occasional "walking and standing." 20 C.F.R. §§ 404.1567(a), 416.967(a).

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job in this category requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." *Walker*, 826 F.2d at 1000; *see also* 20 C.F.R. § 404.1567(b).

When a claimant cannot perform a *full range* of work at a given level of exertion or has nonexertional impairments that significantly limit basic work skills, an ALJ's exclusive reliance on the Medical-Vocational Guidelines to support a finding of nondisability is inappropriate. *Lewis*, 125 F.3d at 1242; *see also Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002); *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999); *Marbury*, 957 F.2d at 839. A *full range* of work means that the claimant is able to do *unlimited* types of work at the given exertional level. *Phillips*, 357 F.3d at 1242.

The Medical-Vocational Guidelines, or "Grids," "provide for adjudicators to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each of these factors can independently limit the number of jobs realistically available to an individual. Combinations of these factors yield a statutorily-required finding of 'Disabled' or 'Not Disabled.'" *Phillips*, 357 F.3d at 1240; *see also Gibson v. Heckler*, 762 F.2d 1516, 1520 (11th Cir. 1985).

One of the factors the Grids considers is age. "The [G]rids divide all claimants into five age categories: 'closely approaching retirement age' 60-64; 'advanced age,' 55-59; 'closely

6

approaching advanced age,' 50-54; 'younger individual I,' 45-49; and 'younger individual II,' 18-44." *Powers v. Heckler*, 738 F.2d 1151, 1152 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1563. In applying the Grids, the ALJ should "use each of the age categories that applies to [the claimant] during the period for which [the ALJ] must determine if [he] is disabled." 20 C.F.R. § 404.1563. The ALJ should not apply the age categories mechanically, and in a borderline situation, may use an older category if appropriate. *Id*.

Grids Rule 201.10 sets out that a claimant who is limited to sedentary work, is closely approaching advanced age, has limited or less education, and has unskilled or no previous work experience should be found disabled. 20 C.F.R. part 404, subpart P, App. 2, table no. 1. Grids Rule 201.14 sets out that a claimant who is limited to sedentary work, is closely approaching advanced age, has an educational background of "[h]igh school graduate or more—does not provide for direct entry into skilled work," and has skilled or semiskilled previous work experience where the skills are not transferable should be found disabled. *Id*. Grids Rule 202.14 sets out that a claimant who is limited to light work, is closely approaching advanced age, has the education of a high school graduate or more, and has skilled or semi-skilled previous work experience where the skills are not transferable should be found not disabled. 20 C.F.R. part 404, subpart P, App. 2, table no. 2.

### V. FACTS

The claimant has a high school diploma and was fifty years old at the time of the administrative hearing. (R. 48). His past work experience includes employment as an automotive mechanic, a parts packer, and a small engine mechanic. (R. 62). The claimant alleges that he is unable to work because of congestive heart failure and degenerative disc disease in his thoracic

and lumbar spine. (R. 47). The claimant testified that his back problems stem from an injury resulting from a fall in the kitchen of his home in July 2009. (R. 56).

*Physical Limitations*

Claimant's undated Disability Report reflects that he is 5' 7", weighs 205 pounds, and can read and write in English. In the Report, he claims to have heart problems and back problems, and says that he stopped working on March 15, 2008 because of his conditions. (R. 130-34).

On April 25, 2009, Dr. Cynthia Anastas saw claimant at Huntsville Hospital. Dr. Anastas noted that claimant had been in "his usual state of health" but had awoken that morning with chest pain and was in mild heart failure on arrival to the emergency room. His total CK (creatine kinase, an enzyme) "was 211 with minimally elevated troponin, chest x-ray confirmed congestive heart failure," D-dimer (a small protein fragment present in the blood) "was equivocal and CT scan of the chest was reportedly negative," and "his repeat electrocardiogram before transfer by the paramedics indicated that there was some mild ST segment elevation inferiorly." (R. 196). Dr. Anastas's discharge summary stated that claimant "underwent emergent cardiac catheterization and received stenting to the right coronary" and, "[m]ore importantly," that "he has marked left ventricular systolic dysfunction, ejection fraction about 20 percent which was confirmed three days later by echocardiography." (R. 199).

On May 12, 2009 and June 25, 2009, Dr. Anastas wrote letters to claimant's referring physician, Dr. Jeffrey Crawford. (R. 214-16). In May, she noted claimant's fatigue and shortness of breath, recommending a congestive heart failure clinic but stating that claimant "needs to resolve his childcare responsibilities and transportation in order to participate." (R. 215). She noted that claimant claimed to be successful "with smoking and alcohol cessation," but also

stated that she was "not optimistic that [his follow-up ejection fraction] is going to improve significantly." (R. 215-16). In June, she reported that claimant had enrolled in the Heart Failure clinic and that his breathing was significantly better. (R. 214).

On July 20, 2009, claimant saw Dr. Max Boone for back pain resulting from a fall in his kitchen. He reported having congestive heart failure that was improving. Dr. Boone prescribed Vicodin, but on July 22, 2009, claimant called in complaining of nausea with the Vicodin and persisting back pain. On July 23, 2009 and July 27, 2009, claimant saw Dr. Boone for follow up visits, reporting improved but persisting back pain. (R. 335). On July 29, 2009, claimant followed up with Dr. Boone, who prescribed Prednisone, Salicylate, and Percocet, and told claimant to call for a spine center referral if his pain did not improve by early the following week. (R. 334).

On August 6, 2009, Dr. Saranya Nadella saw claimant in consultation for Dr. Boone. Claimant reported acute lower back pain as a result of a slip and fall in his kitchen floor two weeks previous. He claimed to have been seen in the Athens Limestone Hospital emergency room at the time of the fall. Dr. Nadella noted that claimant was not in acute distress, had no focal motor deficits, and no focal sensory deficits. Claimant had a negative straight leg raise test bilaterally, a CT scan of the lumbar spine from August 3, 2009 that read as "no acute bony findings, possibly disk bulge at L4-L5," and a CT scan of the thoracic spine from August 3, 2009 that read as "no acute thoracic findings. Mild compression of the T10 vertebral body was seen which is probably old." (R. 242). Dr. Nadella prescribed Flector patches and Lortab, and sent claimant to physical therapy. (R. 243).

On August 11, 13, 17, 20, 24, and 27, 2009, claimant received physical therapy at Athens

Limestone Hospital. At the conclusion of claimant's six prescribed physical therapy visits, the therapist summarized some decrease in claimant's pain and reported that the therapy goals were partially met. He noted that claimant would likely require additional medical intervention. (R. 318-28).

On August 25, 2009, Dr. Anastas wrote a letter to Dr. Max Boone, describing claimant's heart problems and noting that he had been enrolled in the Heart Failure Clinic, but had dropped out two months previously because of his back injury. She reported his vital statistics, including an "EF in the range of about 30%," and recommended that he re-enroll in the Heart Failure Clinic. (R. 213). Dr. Anastas's report from the August examination concluded that claimant's "[o]verall left ventricular systolic function is severely impaired with an EF between 25-30% with severe hypokinesis of the inferopsterior segment." (R. 218).

On September 3, 2009, claimant followed up with Dr. Nadella for his back pain. (R. 241). On September 18, 2009, Dr. Nadella performed right L2-3, L3-4, and L4-5 facet joint injections. (R. 220).

On October 1, 2009 and October 17, 2009, claimant again followed up with Dr. Nadella. She reported that claimant was not in acute distress, had no focal motor deficits, and no focal sensory deficits. She placed him on Lyrica and Lortab, but noted that she could not get an MRI because he had recently had a stent placed. (R. 238-39). On October 9, 2009, Dr. Nadella performed a thoracic epidural at T10-T11 on the right. (R. 221).

On November 11, 2009,  claimant saw Dr. Marshall B. Plotka at Phoenix Emergency Care for pain management, reporting a fall in July and chronic back pain. He reported severe pain, rating it a 9 or 10 out of 10, as well as weakness and difficulty walking. (R. 301-07).

10

On November 15, 2009, claimant went to the emergency room at Decatur General Hospital complaining of chronic mid to lower back pain which he described to be a 10 out of 10 on the pain scale. The emergency room doctors gave claimant medication and discharged him that day with orders to follow up with Dr. Nadella. (R. 226-32).

On November 17, 2009, claimant returned to Dr. Nadella for a follow up visit. Dr. Nadella performed an epidural and prescribed Lortab for claimant's pain, but noted that claimant was not in acute distress, had no focal motor deficits, and no focal sensory deficits. (R. 237).

Claimant followed up with Dr. Plotka beginning on November 30, 2009, at which time claimant described his pain as a 10 out of 10. (R. 296-300). On December 14, 2009, claimant described his pain as a 5 out of 10 and noted that his medications needed to be "a little stronger." (R. 293-95). On December 28, 2009, claimant again described his pain as a 5 out of 10 and stated that his back was feeling much better since MS Contin was added to his medications. (R. 285-92). On January 25, 2010, claimant described his pan as a 3 out of 10, but reported that it was unchanged from the last visit and not adequately relieved by the medication because of side effects of dizziness and headaches. (R. 278-84). On February 22, 2010, claimant reported problems with the morphine he had been prescribed. He described his pain as a 3 out of 10. (R. 271-78). On March 22, 2010, claimant reported his pain as a 3 out of 10. (R. 264-70).

On April 16, 2010, claimant saw Dr. Plotka again. Claimant described his back pain as a 4 out of 10, with breakthrough pain at a 7 out of 10, although Dr. Plotka also noted claimant's pain as being 8 out of 10 at some point. Dr. Plotka noted that claimant came in for routine pain management, stating that he needed a change in medication. According to the report, claimant received a prescription for Darvocet from his dentist, which claimant claimed to have flushed,

11

that violated his narcotic contract and led to him being placed on probation. Dr. Plotka performed a drug screen and adjusted claimant's medication. (R. 257-63).

On April 23, 2010, claimed filled out an Adult Function Report, reporting that he lives in a house with his family and does nothing but watch television and sleep during the day. His conditions affect his sleep because he wakes up short of breath or is woken up by the pain and unable to go back to sleep. He has trouble putting on pants, tying his shoes, bathing, getting up and down on the toilet, and gets out of breath quickly "when doing just about anything." (R. 143-44). He reported that he can drive in an emergency but prefers not to and that the only place he regularly goes is the doctor's office. He marked that his conditions affect his lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair climbing, completing tasks, following instructions, and using hands, and that he can walk 75 feet before needing to rest for 2-4 minutes. Claimant uses a walker and a cane, but in response to the question "Which of these were prescribed by a doctor?" he answered "[h]ad walker before seen dr. & bought cane because I thought it might be useful." (R. 145-49). Claimant concluded his report by summarizing his various ailments, noting specifically that "Dr. Polotka" had increased his morphine pills to two per day and given him a shot because of his increase in back pain. (R. 150).

Claimant also filled out a "Claimant Cardiovascular Questionnaire" on April 24, 2010, noting that he does not exercise, that he can walk 200 feet, and that his chest pressure is "present most all time" and his back pain is constant. (R. 151-52). Claimant's "Drug and Alcohol Use Questionnaire" reported that he quit drinking in April 2009 and that he had never used recreational drugs. (R. 166).

Disability Specialist DeJaneiro Milhouse filled out a "Vocational Rationale Form,"

recommending a maximum work capacity in the light work range, noting examples of jobs claimant could perform to include checker, subassembler, and linen-supply load-builder, and stating that Vocational Rule Number 202.14 provides the framework for a decision of not disabled. (R. 176-78).

On June 15, 2010, Dr. James O. Finney reviewed claimant's medical history as part of the disability determination. Dr. Finney recommended "obtain[ing] CE for comprehensive musceloskeletal exam with ROM in degrees" and "check[ing] with TP and cardiologists to be sure he has not been back or had another echo and office evaluation." If claimant had not had another evaluation, he recommended "obtain[ing] a chest xray read by a radiologist" and "get[ting it] at Huntsville Hospital so it can be compaired [sic] with one from 4/26/09. If normal will not need echo." (R. 370).

On July 7, 2010, Dr. Scott Lynn prepared a "Radiology Consultation Report." He noted: "There are pulmonary granulomas. The heart is normal size and the lungs are otherwise clear. There are no effusions or pneumothoraces. There are degenerative changes in the spine." (R. 371).

On July 14, 2010, Dr. Bhavna Sharma performed a medical evaluation of claimant to aid in the disability determination. She noted that he reported feeling "blah" since his angioplasty in April 2009 and that he stays tired, light headed, and short of breath. He also reported constant pain in his back, as well as debilitating stabbing pain several times a day. Regarding claimant's social history, Dr. Sharma noted that he worked at Kabota tractors until February or March of 2009, when he quit working because the company went out of business and stayed home to help his pregnant wife and take care of the children. After testing, she noted claimant's dexterity and

grip strength to be normal. (R. 374-79).

On July 16, 2010, Dr. Finney completed a "Physical Summary" of claimant. He stated: "Normal cxray as per above is non consistent with 4-5 pillow orthopnea or [shortness of breath] at 20 steps.. [sic] On cardiac ADL stated could walk 200 ft. This makes muscleoskeletal allegations les [sic] reliable." (R. 381). Dr. Finney then filled out claimant's "Physical Residual Functional Capacity Assessment." He concluded that claimant could occasionally lift or carry 20 pounds; frequently lift or carry 10 pounds; stand or walk for about 6 hours in an 8-hour work day; sit for about 6 hours in an 8-hour work day; was limited in his ability to push or pull in his lower extremities; could frequently climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; had no manipulative, visual, or communicative limitations; should avoid all exposure to extreme cold and hazards; and should avoid concentrates exposure to humidity, fumes, odors, dusts, gases, poor ventilation, etc. Dr. Finney supported these conclusions with data from claimant's July 14, 2010 evaluation and ultimately noted that the objective findings did not support the severity of claimant's alleged symptoms. (R. 382-89).

On April 4, 2011, claimant returned to Dr. Nadella for the first time since November 2009. He described his pain as a 10 out of 10 and reported that it was worse with medication. Dr. Nadella prescribed Cymbalta and told claimant to check with the Heart Center about having an MRI. (R. 390-91). On April 15, 2011, claimant had the MRI of his lumbar spine. According to the MRI report, "[m]ultilevel discogenic degenerative change most significant at L4-L5. There is a broad-based posterior disc bulge left lateral component which results in moderate left and mild to moderate right neuroforaminal narrowing." (R. 393-94). Claimant had an MRI of his thoracic

14

spine on May 20, 2011, which revealed "[m]ultilevel discogenic degenerative change. Posterior disc bulges are seen at several levels throughout the thoracic spine with associated neuroforaminal narrowing." (R. 396-97).

On May 16, 2011, Claimant signed an affidavit of work activity, affirming that he had been unable to work because of his disability since April 1, 2009. (R. 190).

*The ALJ Hearing*

After the Commissioner denied the claimant's request for disability insurance benefits and supplemental security income, the claimant requested and received a hearing before an ALJ. (R. 41). At the May 24, 2001 hearing, the claimant testified that he last worked in "about March or April of '07," but stated that he was not certain. (R. 48). He explained that he stopped working to care for his two small children and his ailing father. (R. 49). When asked about chest pain, claimant responded that he had not had chest pain since the stent was placed in his heart, but just feels pressure in his chest. He claimed any exertion makes him short of breath and brings on fatigue, and that he uses a cane "pretty much" all the time. According to claimant, Dr. Plotka at Phoenix prescribed the cane, although it was not documented in Phoenix's records. (R. 49-50).

Claimant testified that he had pain in his lower and middle back all of the time, as well as pain in his left hip and lower right rib cage. He described the pain as a 7 out of 10, but regularly has sharp, stabbing pain that he described as an 8 or 9 out of 10. When asked about medications, claimant reported that the doctor had just started him back on Lortab and that he had previously taken Lortab and Morphine but they had become uneffective. The Morphine caused side effects of fatigue, memory loss, confusion and headaches. Claimant testified that he had tried other treatment options such as physical therapy, epidurals, a TENS unit, and cortisone shots. (R. 50-

15

52).

Claimant testified that he could walk about 150 feet without having to stop, could stand for 10 minutes, could sit 15 to 20 minutes without needing to stand up, could lift 10 pounds, and has problems sleeping because of the pain. He takes two or three naps a day that last from ten minutes to an hour and a half, but still has problems with fatigue. He smoked prior to his heart attack, then quit, but started back about a month prior to the hearing. He claimed he had quit again a week previously and intended to quit permanently. He described his day as getting up at 6:00 or 7:00, seeing his kids off to school, then laying on the couch or bed and watching TV all day. (R. 53-55).

Upon questioning from the ALJ, claimant testified that he had not seen a doctor specifically for his heart condition in about a year because of his financial situation and being unable to pay the co-pay for a specialist. He said that he quit the recommended congestive heart failure clinic because his back problems prevented him from sitting still long enough to participate. He stated that he had last been to a doctor four months prior to the hearing, where he was treated for "dual" purposes, but not specifically for his heart. (R. 55-57).

Claimant denied being able to perform any activities except driving about once a week and stated that he only sees friends and family when they come to see him. He does not go out to eat other than occasionally driving through McDonald's, and is unable to do anything with his children other than watch them play and talk to them. Together with his stepdaughter, claimant cares for his children when they are home on vacations and in the summer, but he testified that his stepdaughter is present the majority of the time. (R. 60).

The ALJ then called the vocational expert, Marcia Shulman, to testify. Ms. Shulman

16

described claimant's vocational history as consisting of work as an automotive mechanic, parts packer, and small engine mechanic. The ALJ then described a hypothetical individual of claimant's age, educational background, and past work experience who could lift 20 pounds occasionally and 10 pounds frequently; who could stand six of eight hours, walk six of eight hours and sit six of eight hours; who could never climb ropes, ladders or scaffolds; who could climb frequently; who could occasionally balance, stoop, kneel, crouch or crawl; who should avoid concentrated exposure to humidity and fumes; and who should never be around hazards. Ms. Shulman testified that such a person could work as an assembler, and inspector/checker, or a machine tender, all of which are present in significant numbers in Alabama and nationally. (R. 61-64).

The ALJ's second hypothetical adjusted the first only by describing a person who could stand two of eight hours and walk two of eight hours. Ms. Shulman testified that the same jobs would be available, but in fewer numbers. The ALJ's third hypothetical described the same individual as hypothetical two, but added that this individual would experience fatigue that would necessitate resting and being away from the workstation in a frequency and duration that would be under the sole discretion of the individual himself. Ms. Shulman stated that if the periods away were brief and occasional, such a limitation would not preclude work, but that if the breaks were for long periods of time on a daily basis, the hypothetical individual would not be able to work on a sustained basis. (R. 64-65).

*The ALJ's Decision*

On July 7, 2011, ALJ Gregory M. Wilson issued a decision finding the claimant was not disabled under the Social Security Act. (R. 24). First, the ALJ found that the claimant met the

insured status requirements of the Social Security Act through September 30, 2009—the date by which claimant was required to establish disability in order to be entitled to a period of disability and disability insurance benefits. Next, the ALJ found that the claimant had not engaged in substantial gainful activity since the April 1, 2009 alleged onset date and that he had the severe impairments of degenerative disc disease of the lumbar and thoracic spine and a history of congestive heart failure and myocardial infarction. (R. 10).

The ALJ then found that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments, noting that he specifically considered Listings 1.00, 4.00, and 11.00. Regarding Listing 4.02, the ALJ stated that "[t]he claimant has experienced systolic failure with an ejection fraction of 30% or less, however, this was not found during a period of stability but was noted during an episode of acute heart failure." (R. 11). The other reasons the ALJ found that the claimant did not meet Listing 4.02 included the lack of persistent symptoms of heart failure, the lack of three or more separate episodes of acute congestive hart failure within twelve months, and the lack of evidence of an inability to perform an exercise tolerance test at the maximum requirement. Furthermore, the ALJ found that the claimant also did not meet Listing 4.04. (R. 11).

Next, the ALJ determined that the claimant had the residual functional capacity ("RFC") to perform a significant range of light work. He specifically found that the claimant could "lift and carry up to 20 pounds occasionally and 10 ponds frequently and stand, walk, and sit for 6 hours each in an 8-hour day;" "frequently climb ramps and stairs;" "occasionally balance, stoop, kneel, crouch, and crawl, and never climb ropes, scaffolds, or ladders;" and "must avoid concentrated exposure to temperature extremes, humidity, and fumes and can never be exposed

18

to hazards." (R. 11). In making this finding, the ALJ followed a two-step process, first determining whether an underlying medically determinable physical or mental impairment exists, and second evaluating the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's functioning. (R. 12).

The ALJ reviewed the claimant's testimony from his hearing, finding "that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the above [RFC] assessment." (R. 12). Specifically, the ALJ commented on treatment notes that revealed that following claimant's episode of congestive heart failure and myocardial infarction in April 2009, claimant's condition improved significantly with treatment and medication; that claimant did not seek cardiac care after August 2009; and that claimant's claims of shortness of breath and fatigue were not documented in his medical examinations, despite his apparent noncompliance with treatment, as noted by Dr. Cynthia Anastas in August 2009. As to claimant's back pain, the ALJ commented that the claimant retained his strength and sensation, that no medical record existed showing that he was prescribed a cane, and that claimant required little medical treatment for his back from April 2010 to April 2011. (R. 12-13).

The ALJ then noted that the "claimant's activities of daily living are also inconsistent with his allegations of such significant functional limitations, but are consistent with the residual functional capacity described above." (R. 13). The ALJ highlighted claimant's testimony he engaged in significant childcare activities—supported by claimant's July 2010 report that he quit working in February or March 2009 to stay home with his kids and his May 2009 claim that he

19

needed to resolve his childcare responsibilities before enrolling in a heart failure clinic. (R. 13).

According to the ALJ, claimant's "inconsistent reports regarding his last work" further reduced his credibility. The ALJ cited the various claims he had made regarding his last work, and concluded that "the record generally indicates that the claimant stopped working for reasons other than his severe impairments or medical condition." (R. 13). The ALJ then reiterated the claimant's noncompliance with his treatment regimen, failure to seek care for long periods of time, and admitted overuse of his prescription narcotic medication, all implying that claimant's allegations about symptoms and pain were exaggerated. The ALJ also noted claimant's failure to quit smoking. (R. 13-14).

As to claimant's RFC, the ALJ noted that none of claimant's treating physicians had offered a medical opinion as to the claimant's functional limitations. The ALJ looked to the State Agency medical consultant's finding that the claimant was not disabled, noting that the opinion did not deserve as much weight as that of a treating physician, but that it deserved some weight as it was generally supported by the evidence except for the limitation from all exposure to extreme cold. (R. 14).

The ALJ then reviewed the claimant's medical history as to his congestive heart failure and myocardial infarction and his degenerative disc disease. He specifically discussed claimant's April 25, 2009 hospitalization, his enrollment in a heart failure clinic, his dropping out of the clinic after two months, his reports of improvement in July 2008 and June 2009, his various test results in August 2009, his November 15, 2009 emergency room visit, and his January, February, April, and July 2010 examinations. As a result of claimant's congestive heart failure and myocardial infarction, the ALJ found "a limitation to light work with no more than frequent

20

climbing of ramps and stairs; more than occasional balancing, stooping, kneeling, crouching, and crawling; no climbing of ropes, scaffolds, or ladders or exposure to hazards; and the avoidance of concentrated exposure to temperature extremes, humidity, and fumes to be warranted." (R. 14-15).

Next, the ALJ reviewed the claimant's medical history as to his degenerative disc disease. He specifically discussed claimant's initial treatment following a fall in July 2009, his August 2009 CT scan, his November 15, 2009 emergency room visit, his December 2009, January 2010, February 2010, and April 2010 follow-up reports, his April 2010 violation of his narcotic medication agreement, his July 2010 consultative examination, and his April 2011 return to treatment after not having sought back treatment for a year. As a result of claimant's degenerative disc disease, the ALJ found "that a limitation to light work activity with no more than frequent climbing of ramps and stairs; more than occasional balancing, stooping, kneeling, crouching, and crawling; and no climbing of ropes, scaffolds, or ladders or exposure to hazards is appropriate." (R. 15-16).

Moving on to the next step, the ALJ concluded that the claimant was unable to perform any past relevant work. The ALJ noted that the claimant was 48 years old at the alleged disability onset date, which is defined as "an individual closely approaching advanced age." He noted the claimant's high school education and ability to communicate in English and found that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills." (R. 16).

Finally, the ALJ determined that "[c]onsidering the claimant's age, education, work

experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 16). The ALJ noted that the application of Medical-Vocational Rule 202.14 would direct a finding of "not disabled" if claimant could perform a full range of light work, but that because claimant had additional limitations, the ALJ had consulted a vocational expert. The vocational expert testified that claimant would be able to perform jobs such as assembler, inspector/checker, and machine tender, all of which had significant numbers of jobs available in the national economy. The ALJ ultimately concluded that the "claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2009, through the date of this decision . . . ."

## VI. DISCUSSION

### A. Whether the ALJ properly evaluated the opinion of Dr. Anastas

The first issue that the court will address is whether the ALJ properly evaluated the opinion of Dr. Anastas. Claimant raises this issue in conjunction with his objections about Listing 4.02, but it is a separate issue that the court must address before evaluating the Listing. Specifically, claimant argues that the ALJ incorrectly stated that Dr. Anastas's diagnoses of claimant's ejection fraction was not found during a period of stability and that the ALJ did not properly consider the records from Apex Cardiology indicating that claimant had ongoing severe symptoms of congestive heart failure. (Doc. 7, at 5-7).

An ALJ commits reversible error if he exceeds his discretion by substituting his own impressions for the medical evidence when making a determination of disability. *See Marbury*, 957 F. 2d at 840 (Johnson concurring). As to the first objection raised by the claimant concerning claimant's ejection fraction, the court finds that the ALJ did not improperly substitute his own

opinion, but instead overlooked a key fact in the record. The ALJ cites claimant's first ejection fraction diagnosis of 20%, correctly noting that it did not occur during a period of stability. The ALJ seemed to overlook, however, claimant's second ejection fraction diagnosis of 25-30%, which Dr. Anastas reported in her August 25, 2009 letter to Dr. Boone. (R. 218). This second ejection fraction diagnosis occurred four months after claimant's episode of acute heart failure during what appears to be a period of stability—although not specifically called such by any medical professional. Although overlooking this second diagnosis was an error, which the court will consider when it examines whether the ALJ properly considered Listing 4.02, it was not a substitute of the ALJ's own opinion for the medical evidence. As such, the court will not consider it to be reversible error at this point.

Claimant's other objection on this issue involves the ALJ's conclusion that "claimant did not apparently seek out or require any cardiac care following August 2009." (R. 13). Claimant asserts that this statement is a substitute of the ALJ's own judgment for the medical opinion of Dr. Anastas, who expressed a desire that claimant re-enroll in the Heart Failure Clinic and continue receiving care there. The court finds that the ALJ's statement about claimant not requiring care after August 2009 was not intended to be a characterization of Dr. Anastas's opinions, but rather an observation concerning claimant's behavior that the ALJ considered *in conjunction* with the medical records from Dr. Anastas. The record does reflect that claimant did not seek cardiac care after August 2009 and also includes instances of claimant downplaying his heart condition and indicating that it was not his primary complaint—such as in the ALJ's hearing when claimant testified that he had not had actual chest pain since April of 2009, but merely experienced pressure. Furthermore, the ALJ considered medical evidence, not his own

23

impressions, when noting the absence of notes about shortness of breath or fatigue when claimant

visited his other doctors. Ultimately, this court finds that other than overlooking Dr. Anastas's

second ejection fraction diagnosis, the ALJ properly evaluated her opinions and did not substitute

his own judgment for the medical evidence.

**B. Whether the ALJ properly considered claimant's case in light of Listing 4.02**

The second issue the court will address is whether the ALJ properly considered

claimant's case in light of Listing 4.02. Claimant argues that he meets the requirements of the

Listing and should be found disabled on that basis. To meet Listing 4.02 for chronic heart failure,

the claimant has the burden of proving that he meets one of the requirements from part A of the

Listing and one of the requirements from part B of the Listing. 20 C.F.R. Pt. 404, Subpt. P, App.

1; *see also Barron*, 924 F.2d at 229.

Claimant claims to meet Section A.1 of the Listing, which requires "[m]edically

documented presence of . . . [s]ystolic failure . . . with . . . ejection fraction of 30 percent or less

during a period of stability (not during an episode of acute heart failure) . . . ."  20 C.F.R. Pt. 404,

Subpt. P, App. 1.  As the court discussed in the previous section, the ALJ apparently overlooked

Dr. Anastas's second ejection fraction diagnosis, which did show less than 30% during a period

of apparent stability, meeting the requirement for Section A.1 of Listing 4.02.

As for part B of the Listing, Section B.1 requires that the medically documented problem

from part A results in "[p]ersistent symptoms of heart failure which very seriously limit the

ability to independently initiate, sustain, or complete activities of daily living in an individual for

whom [a medical consultant], preferably one experienced in the care of patients with

cardiovascular disease, has concluded that the performance of an exercise test would present a

24

significant risk to the individual . . . ." 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In arguing that he meets this requirement, claimant cites the first part of Section B.1—concerning the persistent symptoms of heart failure—but conveniently ignores the part requiring that a medical consultant conclude that "the performance of an exercise test would present a significant risk to the individual." The ALJ found that claimant did not meet any of the requirements under part B, claimant does not claim that an MC concluded that he could not perform an exercise test, and this court does not find any evidence of such in the record. As such, the court finds that the ALJ's conclusion that the claimant did not meet Listing 4.02 was correct.

Although the ALJ did err in failing to consider Dr. Anastas's second ejection fraction diagnosis, the court finds this error to be harmless because claimant was still unable to meet one of the requirements for part B under the Listing. The Eleventh Circuit has noted that when an error does not ultimately contradict the ALJ's findings, the decision will stand. *Caldwell v. Barnhart*, 261 F. App'x. 188, 190 (11th Cir. 2008) ("When, however, an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's findings, the ALJ's decision will stand.") Thus, the ALJ's decision that claimant is not disabled under Listing 4.02 stands.

**C. Whether the ALJ erred in finding the claimant to have a residual functional capacity to perform at the light level of physical exertion**

The third issue the court will address is whether the ALJ should have found the claimant to have an RFC to perform at the sedentary level of physical exertion, rather than the light level. Claimant raises this issue in the context of his argument about the Medical-Vocational Guideline, but the court must determine the correct RFC as a necessary first step before examining the

25

application of the Grids.

An RFC assessment involves the consideration of all relevant evidence to determine the claimant's ability to do work in spite of his impairments. *Lewis*, 125 F.3d at 1440; *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The ALJ specifically considers the claimant's ability to lift weight, sit, stand, push, pull, etc. when determining the claimant's RFC. 20 C.F.R. §§ 404.1545(b), 416.945(b).

The C.F.R. classifies jobs into four levels of exertion: sedentary, light, medium, or heavy. 20 C.F.R. §§ 404.1567, 416.967. Sedentary work requires extended periods of sitting; "lifting no more than 10 pounds;" occasional "lifting or carrying articles like docket files, ledgers, and small tools;" and occasional "walking and standing." 20 C.F.R. §§ 404.1567(a), 416.967(a). "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job in this category requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." *Walker*, 826 F.2d at 1000; *see also* 20 C.F.R. § 404.1567(b).

In this case, the record does not include any opinions on claimant's RFC from any of his treating physicians. Therefore, the ALJ had to determine claimant's RFC based on the conclusions of the State Agency medical consultants, claimant's testimony, and the ALJ's own interpretation of how the existing medical records from claimant's treating physicians should translate into an RFC.

In considering the conclusions of the State Agency medical consultants, the ALJ

appropriately afforded them some weight because they were supported by the medical evidence, but did give them as much weight as the medical opinions of claimant's treating physicians. In fact, the ALJ did not summarily accept the conclusion of the medical consultant, but actually adjusted the recommended RFC to a slightly lower level based on his own review of the medical evidence. Furthermore, the ALJ's opinion included an extensive review of the medical evidence provided by all of the physicians, showing that the ALJ did take into account the opinions of claimant's treating physicians.

One of the primary reasons the ALJ cites for finding that claimant had an RFC of light instead of sedentary is claimant's lack of credibility. The ALJ supports this conclusion by pointing to specific inconsistencies in the record—such as claimant's varying reports about when he quit working and why, and claimant's noncompliance with certain aspects of his recommended treatment. In addition, claimant has not pointted this court toward any specific evidence from the medical record that is markedly contrary to the ALJ's finding of a light RFC. Because the ALJ's RFC finding is supported by substantial evidence, the court finds that it will stand.

**D. Whether the ALJ properly considered claimant's case in light of Medical-Vocational Guideline 201.10**

The final issue that this court will address is whether the ALJ properly considered claimant's case in light of Medical Vocational Guideline 201.10. Claimant alleges that the ALJ miscalculated both the claimant's age and physical exertion level when considering the Grids. The Grids provide a system whereby the ALJ can consider a number of factors such as "age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and

27

lack of job experience" to yield a statutorily-required finding of "Disabled" or "Not Disabled." *Phillips*, 357 F.3d at 1240; *see also Gibson*, 762 F.2d at1520.

For the age factor, "[t]he [G]rids divide all claimants into five age categories: 'closely approaching regiment age' 60-64; 'advanced age,' 55-59; 'closely approaching advanced age,' 50-54; 'younger individual I,' 45-49; and 'younger individual II,' 18-44." *Powers*, 738 F.2d at 1152; *see also* 20 C.F.R. § 404.1563. In applying the Grids, the ALJ should "use each of the age categories that applies to [the claimant] during the period for which [the ALJ] must determine if [he] is disabled," but the ALJ should not apply the age categories mechanically. The ALJ may use an older category if appropriate in a borderline situation. 20 C.F.R. § 404.1563.

Under Grids Rule 201.10, a claimant who is limited to sedentary work, is closely approaching advanced age, has limited or less education, and has unskilled or no previous work experience should be found disabled. 20 C.F.R. part 404, subpart P, App. 2, table no. 1. Under Grids Rule 201.14, a claimant who is limited to sedentary work, is closely approaching advanced age, has an educational background of "[h]igh school graduate or more—does not provide for direct entry into skilled work," and has skilled or semiskilled previous work experience where the skills are not transferable should be found disabled. *Id*. Under Grids Rule 202.14, a claimant who is limited to light work, is closely approaching advanced age, has the education of a high school graduate or more, and has skilled or semi-skilled previous work experience where the skills are not transferable should be found not disabled. 20 C.F.R. part 404, subpart P, App. 2, table no. 2.

Claimant objects to the ALJ's consideration of claimant's age as 48; however, even in noting that claimant's age was 48 at the alleged disability onset date, the ALJ still considered the

claimant to fall in the "closely approaching advanced age" category that applies to individuals ages 50-54. Bumping claimant up an age category was within the ALJ's discretion and only served to make it *more* likely that the claimant would be found disabled; therefore, this court finds no error in the calculation of claimant's age. Claimant also objected to the ALJ using a light RFC, rather than a sedentary RFC. As previously discussed, the ALJ's determination of a light RFC is supported by substantial evidence.

Applying these factors to the Grids calculation, claimant does not fit under Grids Rule 201.10 as he claims, or under Grids Rule 201.14, which he also mentions, because his RFC is not sedentary. Claimant most closely fits under Grids Rule 202.14, which requires a finding of "Not Disabled." The ALJ, however, correctly did not rest his decision on this Grids rule, because the ALJ's actual RFC finding was not simply "light," but was "light" with additional limitations.

Under the law, when a claimant cannot perform a *full range* of work at a given level of exertion, an ALJ's exclusive reliance on the Medical-Vocational Grids to support a finding of nondisability is inappropriate. *Lewis*. at 1242; *see also Wilson*, 284 F.3d at 1227; *Jones*, 190 F.3d at 1229; *Marbury*, 957 F.2d at 839. A *full range* of work means that the claimant is able to do *unlimited* types of work at the given exertional level. *Phillips,* 357 F.3d at 1241 (emphasis added). Here, the ALJ appropriately called in a vocational expert to consider the specific nuances of claimant's limitations and advise him on the available jobs based on those limitations. Therefore, the ALJ did not err in failing to apply Grids Rule 201.10, and his conclusion that claimant is not disabled is supported by substantial evidence.

## VII. CONCLUSION

For the reasons as stated, this court concludes that the decision of the Commissioner is

supported by substantial evidence and is due to be AFFIRMED. The court will enter a separate

order to that effect simultaneously.

DONE and ORDERED this 26th day of March, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE